UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BHARAT BAWA,

Plaintiff,

CASE NO: 1:26-cv-3191

vs.

HON.

**CITY OF PORTAGE**; **KALAMAZOO COUNTY**; **RICHARD C. FULLER, III**, Sheriff of Kalamazoo County, in his individual capacity; **MYKENZIE HASSING**, in her individual capacity; **JOHN DOE CORRECTIONS DEPUTIES 1-10**, in their individual capacities; **DETECTIVE NATHAN SLAVIN**, in his individual capacity; **DETECTIVE DERRICK HESS**, in his individual capacity; and **JOHN DOE PORTAGE PROPERTY CUSTODIANS 1–5**, in their individual capacities,

Defendants.

_______________________________________/

Maggie P. George (P85651)
Melinda M. Gaied (P87996)
GEORGE LAW
Attorneys for Plaintiff
444 S. Washington Ave,
Royal Oak, MI 48067
mgeorge@georgelaw.com
mgaied@georgelaw.com

_______________________________________/

## COMPLAINT AND JURY DEMAND

Plaintiff, BHARAT BAWA ("Plaintiff" or "Mr. Bawa"), by and through his attorneys, GEORGE LAW, and for his Complaint alleges as follows:

## NATURE OF THE ACTION

1. This is a civil-rights action under 42 U.S.C. § 1983 and Michigan law on behalf of Bharat Bawa, a young man from India living in Canada, who spent 188 days in the Kalamazoo County Jail on charges that should never have been brought and that the State later abandoned.

2. Mr. Bawa had never been convicted of a crime. He was never convicted of the crimes he was accused of that led to his 188-day detention. After six months in which the People did not produce the evidence his defense attorneys repeatedly demanded, the prosecutor dismissed every charge against Mr. Bawa on January 15, 2026, days before the scheduled trial.

3. Inside the Jail, Mr. Bawa was cut off from the outside world for at least one week while staff told his worried friends that he was refusing to speak with them. Upon his arrest, he was placed in a mental-health unit with no explanation, despite having absolutely no history of mental health issues. For six months, he was never allowed outside. He slept in an overcrowded cell, was assaulted and had a tooth broken, was made to mop up sewage at 2:00 in the morning, and was told to cut out his own ingrown toenail.

4. Outside the Jail, the City of Portage has kept $29,000, CAD $400, and the iPhone its officers seized from him. It still holds Mr. Bawa's property over ten months after the charges were dismissed and more than five months after the Kalamazoo County Circuit Court ordered them returned.

5. Mr. Bawa seeks compensation for these injuries and the immediate return of his property.

## PARTIES, JURISDICTION, AND VENUE

***The Parties***

6. Plaintiff Bharat Bawa is a 24-year-old man who is a citizen of India. He resides in New Brunswick, Canada.

7. Defendant City of Portage ("the City") is a Michigan municipal corporation in Kalamazoo County. It operates the Portage Department of Public Safety ("PDPS") and is responsible for PDPS policies, training, and supervision and for property in PDPS custody.

8. Defendant Kalamazoo County ("the County") is a Michigan municipal corporation. Through its Sheriff's Office, it operates the Kalamazoo County Jail ("KCJ" or the "Jail") at 1500 Lamont Avenue, Kalamazoo, and is responsible for the Jail's policies, staffing, training, supervision, conditions, and health care.

9. Defendant Richard Fuller ("Sheriff Fuller") is the Sheriff of Kalamazoo County and the final policymaker for the Jail. He is sued in his individual capacity.

10. Defendant Mykenzie Hassing was a member of the Jail's medical staff who responded to Mr. Bawa's request for medical care. She is sued in her individual capacity.

11. Defendants John Doe Corrections Deputies 1–10 (the "Deputy Defendants") are Jail deputies, sergeants, and other staff, not yet identified, who were responsible for Mr. Bawa's housing, classification, communication, safety, and access to medical care. They are sued in their individual capacities.

12. Detective Nathan Slavin and Detective Derrick Hess are PDPS detectives who were involved in the arrest of Mr. Bawa. They are sued in their individual capacities.

13. John Doe Portage Property Custodians 1–5 (the "Property Custodian Defendants") are PDPS officers and employees, not yet identified, responsible for keeping and releasing the property seized from Mr. Bawa. They are sued in their individual capacities.

14. Every individual Defendant acted under color of state law and within the scope of his or her employment at all relevant times.

***Jurisdiction and Venue***

15. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and § 1343(a), and supplemental jurisdiction over his state-law claims under 28 U.S.C. § 1367(a).

16. Venue lies in this District and Division under 28 U.S.C. § 1391(b) because Defendants reside here and the events giving rise to these claims occurred in Kalamazoo County.

## FACTS

***The Arrest***

17. In June 2025, a fraud ring persuaded Margaret Ayers, a 72-year-old Portage resident, to buy gold coins and hand them to supposed "Treasury Detectives" sent by a caller named "Josh." On June 11 and 16, 2025, she gave about $162,289 in gold to a courier who called himself "Harry."

18. Iowa investigators later arrested that courier, Karanpreet Singh ("Singh"), and executed a search warrant on Singh's phone. Upon discovering that the victim in Singh's case was located in Portage, the Iowa Insurance Division Fraud Bureau alerted PDPS. PDPS was able to identify Ms. Ayers as the victim. Absolutely nothing that PDPS learned from Iowa law enforcement, or from Ms. Ayers, identified Mr. Bawa or suggested his involvement. Mr. Bawa had no role in the June transactions and never communicated with or met Ms. Ayers.

19. From July 8 to 11, 2025, PDPS detectives used Ms. Ayers' phone to pose as her and arrange with "Josh" for another "Treasury Detective" to collect decoy gold near Mancino's restaurant on Shaver Road in Portage. This meeting was to occur on July 11, 2025.

20. Cellebrite data from Ms. Ayers' phone revealed that in the messages between "Josh" and the PDPS detectives, "Josh" indicated that the "Treasury Detective" Ms. Ayers was meeting on July 11, 2025, was a "black guy." Despite this, PDPS circulated that the suspect was middle eastern.

21. PDPS Detective Nathan Slavin parked in the Mancino's parking lot and observed a black Toyota Camry driven by an individual who was "clearly a young middle eastern man" park at Barrett's Smokehouse, approximately a 5-minute walk from Mancino's. The driver (later identified as Mr. Bawa) exited the vehicle and began walking in the direction of Mancino's.

22. PDPS Detectives Slavin and Hess approached Mr. Bawa as he walked along Beethoven Avenue near Shaver Road. Detective Slavin had his gun drawn. They ordered Mr. Bawa to stop and put his hands behind his back. He complied, was handcuffed, and was told only that he was being "detained." PDPS detectives seized his Apple iPhone.

23. Mr. Bawa never reached or spoke to the undercover officer posing as Ms. Ayers. Nothing changed hands.

24. Without ever being informed of the reason for his arrest, Mr. Bawa was transported to PDPS for an interview. Mr. Bawa invoked his right to remain silent and was subsequently transported to the Kalamazoo County Jail.

25. PDPS impounded the car Mr. Bawa had driven and, under a search warrant, seized $28,000 in U.S. currency from the car and $1,000 in U.S. currency and CAD $400 from his wallet. With his Apple iPhone, these items are referred to as the "Property."

26. No one other than Mr. Bawa has claimed the Property.

27. At least ten law-enforcement officers took part in the operation. No body-worn or dash camera footage of the operation or the arrest was ever produced throughout the criminal proceedings that ensued, despite repeated requests from Mr. Bawa's defense counsel.

28. After Mr. Bawa was in custody and PDPS had his phone, "Josh" continued messaging the decoy phone that the courier was nearby, eliminating any possibility that Mr. Bawa was "Josh."

***Lack of Probable Cause***

29. At the time PDPS executed this operation, they had no reason to be specifically searching for a "middle eastern" man. Ms. Ayers had described "Harry" as middle eastern, but at the time of this operation, it had already been determined that "Harry" was Karanpreet Singh, and Singh was already in custody in Iowa.

30. "Josh" specifically indicated in text messages to the undercover PDPS detectives using Ms. Ayers' phone that the "Treasury Detective" coming to meet her on July 11th was a "black guy," though *none* of the at least ten law enforcement personnel involved in this operation mention that detail in their written narratives.

31. At no time did Mr. Bawa make contact with the undercover officer, nor was any money or gold ever exchanged. He simply walked in the officer's direction. Mr. Bawa contends that he actually walked past the undercover officer before PDPS officers exited their vehicles and arrested him. However, no body camera or dash camera footage from *ANY* of the at least ten law enforcement officials involved in this operation was produced to Mr. Bawa or his defense counsel throughout the criminal proceedings.

32. PDPS officers had no reason to suspect that Mr. Bawa was involved in Singh's operation. Nothing discovered through the search of Singh's phone tied him to Mr. Bawa, and

officers had no reason to be searching for a middle eastern man aside from their assumptions and racial biases.

***The Prosecution and Its Dismissal***

33. Mr. Bawa was charged with false pretenses of $100,000 or more, MCL 750.218(7)(a), and using a computer to commit a crime, MCL 752.796. Bond was set at $500,000 cash on July 12, 2025, then reduced to $250,000 cash or surety with a GPS tether on July 14. However, he could not post even the reduced bond amount. Mr. Bawa remained in custody throughout the entirety of the criminal proceedings.

34. Beginning July 23, 2025, Mr. Bawa's defense counsel asked again and again for the following core pieces of evidence: the Iowa police reports, the arrest videos, the warrant for and results of any search of Mr. Bawa's phone, and the rental-car records. For six months the People produced none of it.

35. At the December 5, 2025, final pretrial, with trial set for the following week, the People obtained an adjournment over defense objection to gather discovery. The trial was adjourned to January 21, 2026. By January 13, 2026, the People still had not produced any of the evidence described above, and the defense moved to dismiss.

36. On January 15, 2026, the prosecutor moved for a nolle prosequi because "[t]he interests of justice would best be served by the dismissal of this case." The Circuit Court dismissed all charges that day.

37. Mr. Bawa walked out of the Jail on January 15, 2026, with a $24.55 debit card. He had no phone and no money.

***The Property Portage Refuses to Return***

38. No charges are pending against Mr. Bawa as of the date of the filing of this action. No forfeiture action has been filed, and Mr. Bawa has received no notice of any pending proceedings.

39. On February 13, 2026, Mr. Bawa moved in the criminal case for return of the Property. On May 27, 2026, the Circuit Court granted the motion and ordered the return of his iPhone, $29,000 in U.S. currency, and CAD $400.

40. As of the date of the filing of this action, the City has returned none of Mr. Bawa's Property. Mr. Bawa has been told only that it is being held "pending further investigation." Following the court order to return the Property, PDPS frivolously produced a police report dated June 5, 2026, reflecting a potential "fraud" charge and attaching a nearly identical narrative to the initial police report, knowing that the charges based on that report had already been dismissed.

41. PDPS produced this police report to justify keeping the Property "pending further investigation." No new charges have been brought as of the date of the filing of this action.

42. The City has no lawful basis to keep the Property. Without it, Mr. Bawa has lost access to his savings, his personal data, his contacts, and his accounts.

***Kalamazoo County Jail***

43. Upon Mr. Bawa's arrival at KCJ, he repeatedly requested to make a phone call. Each request was denied or ignored, and Mr. Bawa was isolated and unable to notify family or friends of his arrest.

44. Mr. Bawa had no history of mental illness, no diagnosis, and no prior evaluation, and he reported none at booking. The Jail nonetheless placed him in a mental-health housing unit, without evaluation, explanation, or hearing, for about 11 days.

45. The unit was infested with ants. Its shower was broken and stayed broken after Mr. Bawa reported it. Banging and noise were constant. He had no access to a telephone.

46. Mr. Bawa pressed the emergency call button and begged deputies, again and again, to let him make one phone call. The deputies refused or ignored him.

47. After not hearing from Mr. Bawa for several days, his friends began calling border authorities to see if something happened to him. They eventually called a police department to report Mr. Bawa as a missing person. The individual they spoke to at the police department searched their database for any reports of Mr. Bawa and informed his friends that he had been arrested and was in custody in KCJ.

48. Mr. Bawa's friends repeatedly called KCJ and were told that Mr. Bawa had been offered phone calls and visitation but that he refused. That was untrue. A friend who came to the Jail was turned away on the same false basis and put money in Mr. Bawa's account thinking he lacked funds make a call.

49. Mr. Bawa was only permitted to make a phone call after his friends persistently contacted the Jail. At least seven days had passed since his arrest before he was allowed to make a call. During that week of isolation, Mr. Bawa suffered severe distress, including thoughts of suicide.

***Six Months Inside***

50. Around July 22, 2025, after arbitrarily being held in the mental health housing unit for approximately 11 days with no explanation, Mr. Bawa was moved to general population as a minimum-security detainee. Around August 2025, with no misconduct, ticket, or explanation, he was reclassified as medium security.

51. From August 2025 to January 2026, Mr. Bawa was housed in a six-person cell holding seven men, one of whom had to sleep on the floor. Bullying and food theft were constant due to the overcrowding.

52. On one occasion, Mr. Bawa was pushed by another inmate, causing his face to strike metal bars and break a front tooth.

53. In a separate incident, detainees in a neighboring cell assaulted Mr. Bawa by throwing urine into his cell, hitting him.

54. On at least one occasion, deputies refused to serve the inmates lunch.

55. One night, the toilet in Mr. Bawa's cell overflowed, flooding the cell with sewage. Rather than moving the inmates out and sanitizing the cell, deputies gave Mr. Bawa a mop to clean up the sewage himself at around 2:00 AM.

56. Mr. Bawa was in KCJ for 188 days. During that time, he was not allowed outside other than for purposes of transporting him to court for scheduling hearings. He had no outdoor recreation, no fresh air, and no sunlight for over six months.

57. Mr. Bawa left the jail weighing about 50 pounds less than he did when he went in.

***Told to Treat Himself***

58. While in custody, Mr. Bawa developed a severe ingrown toenail with bleeding and signs of infection that prevented him from being able to walk or sleep. He submitted a request for medical assistance to remove it.

59. Defendant Mykenzie Hassing, a member of the Jail's medical staff, responded to his request two days later. Without examining him, Defendant Hassing refused to provide treatment while also acknowledging that improper treatment could "lead to worse problems." Mr. Bawa was

given nail clippers and told to “do it himself.” He removed the toenail himself with no medical care nor sanitation supplies. He experienced excruciating pain as a result.

60. In July 2026, the Sheriff's Office certified in response to a public-records request that no records exist of any medical treatment given to Mr. Bawa.

***The County's Policies and Customs***

61. What happened to Mr. Bawa was the product of County policy and custom, including:

a. denying detainees any outdoor exercise for months at a time;

b. housing new detainees in mental-health units with no clinical basis, and denying them telephone access;

c. telling callers and visitors that detainees have "refused" contact without confirming it;

d. housing detainees beyond cell capacity;

e. leaving detainees in place to clean up sewage;

f. closing medical requests without examination and telling detainees to treat themselves; and

g. failing to train and supervise staff on detainee communication, safety, sanitation and medical requests.

62. These practices, policies, and customs were open, ongoing, and affected many detainees. Sheriff Fuller, the Jail's final policymaker, knew or should have known of them and allowed them to continue.

***Injuries***

63. As a direct result of Defendants' conduct, Mr. Bawa has suffered:

a. a broken front tooth, injury to his toe, significant weight loss, and physical pain;

b. severe insomnia, hypervigilance, anxiety, an exaggerated startle response, involuntary leg shaking and other symptoms of post-traumatic stress;

c. exposure to human waste;

d. fear, humiliation, and emotional distress;

e. the loss of $29,000, CAD $400, his phone and its data;

f. the loss of his job and his US immigration status;

g. the loss of an application for Canadian immigration status for family members who are being persecuted abroad;

h. the loss of his Canadian work permit as he was in custody at the time he was supposed to renew it and was unable to do so, causing it to expire, and his subsequent inability to obtain employment; and

i. legal fees incurred in the defense of the frivolous criminal case and to pursue the return of his property.

**<u>CLAIMS FOR RELIEF</u>**

**COUNT I**

**UNREASONABLE SEIZURE – ARREST WITHOUT PROBABLE CAUSE**

*(42 U.S.C. § 1983; Fourth Amendment — Against Detective Slavin and Detective Hess)*

64. Plaintiff incorporates all preceding paragraphs.

65. The Fourth Amendment prohibits the arrest of a person without probable cause to believe that he has committed or is committing a crime.

66. On July 11, 2025, Defendants Slavin and Hess seized Mr. Bawa at gunpoint, handcuffed him and placed him under arrest.

67. When they arrested him, Mr. Bawa had not met, spoken, exchanged, or received anything from the undercover officer. He was walking on a public street. Defendants did not know who he was, had no description of him besides his apparent ethnicity, and had no information showing that he knew of, or intended to take part, in any crime. The only description Defendants had of the individual they were supposed to be looking for was that he was a “black guy.” Mr. Bawa is not black.

68. Under the totality of the circumstances, the facts known to Defendants Slavin and Hess at the time of the arrest did not give them probable cause to believe Mr. Bawa had committed or was committing a crime.

69. The right to be free from arrest without probable cause was clearly established at the time, and no reasonable officer could have believed the arrest was lawful on these facts.

70. As a direct and proximate result, Mr. Bawa was deprived of his liberty for over six months, humiliated, and had his phone and property seized, and suffered the other injuries described in paragraph 63.

**COUNT II**

**PUNITIVE CONDITIONS OF PRETRIAL CONFINEMENT**

*(42 U.S.C. § 1983; Fourteenth Amendment — Against the Deputy Defendants, Kalamazoo County, and Sheriff Fuller)*

71. Plaintiff incorporates all preceding paragraphs.

72. As a pretrial detainee, Mr. Bawa could not be punished and was entitled to conditions meeting basic human needs.

73. Six months without outdoor exercise, a mental-health placement with no basis, an increased security risk reclassification with no basis, housing detainees in overcrowded cells,

exposure to sewage and urine, and missed meals, separately and together, posed a substantial risk of serious harm and served no legitimate purpose.

74. The Deputy Defendants acted deliberately and recklessly in the face of a risk they knew of or that was obvious and did nothing reasonable to reduce it.

75. Kalamazoo County is liable because these conditions were caused by its policies and customs of denying detainees outdoor exercise for months at a time, housing detainees beyond cell capacity, placing new detainees in mental-health housing without a clinical basis, reclassifying detainees' security risk with no basis, and leaving detainees in place to clean up sewage, and by its failure to train and supervise staff on detainee housing and sanitation. Kalamazoo County was deliberately indifferent to the obvious risk that its policies, customs, and failure to train and supervise staff would violate detainees' constitutional rights.

76. Sheriff Fuller, the Jail's final policymaker, established and/or knew of these policies and customs, and was deliberately indifferent to the obvious risk that they would violate detainees' constitutional rights.

77. These policies and customs were the moving force behind the violations of Mr. Bawa's rights.

78. Mr. Bawa suffered the injuries described in paragraph 63.

## COUNT III

## INCOMMUNICADO DETENTION

*(42 U.S.C. § 1983; First and Fourteenth Amendments — Against the Deputy Defendants, Kalamazoo County, and Sheriff Fuller)*

79. Plaintiff incorporates all preceding paragraphs.

80. A pretrial detainee keeps the right to communicate with family and friends, subject only to reasonable restrictions tied to legitimate institutional needs.

81. For at least seven days, the Deputy Defendants refused Mr. Bawa any phone call, turned away his visitor, and falsely told his friends he had refused contact. No legitimate interest justified it.

82. Kalamazoo County is liable because this deprivation was caused by its policies and customs of denying telephone access to detainees placed in mental-health housing and of telling callers and visitors that detainees have "refused" contact without confirming it, and by its failure to train and supervise staff on detainee communication. Kalamazoo County was deliberately indifferent to the obvious risk that its policies, customs, and failure to train and supervise staff would violate detainees’ constitutional rights.

83. Sheriff Fuller, the Jail's final policymaker, established and/or knew of these policies and customs and was deliberately indifferent to the obvious risk that they would violate detainees' constitutional rights.

84. These policies and customs were the moving force behind the violations of Mr. Bawa's rights.

85. Mr. Bawa suffered severe emotional distress, including suicidal thoughts, and the other injuries described in paragraph 63.

**COUNT IV**

**FAILURE TO PROTECT**

*(42 U.S.C. § 1983; Fourteenth Amendment — Against the Deputy Defendants, Kalamazoo County, and Sheriff Fuller)*

86. Plaintiff incorporates all preceding paragraphs.

87. The Deputy Defendants were required to protect Mr. Bawa from violence by other detainees.

88. By arbitrarily reclassifying him as medium security, overcrowding his cell, tolerating persistent bullying, and failing to supervise the unit, Defendants recklessly disregarded an obvious risk that Mr. Bawa would be attacked.

89. Mr. Bawa was attacked: shoved into the bars, his tooth broken, and doused with urine.

90. Kalamazoo County is liable because this violation was caused by its policies and customs of arbitrary reclassification of detainees, housing detainees beyond cell capacity, and inadequately supervising housing units, and by its failure to train and supervise staff on protecting detainees from one another. Kalamazoo County was deliberately indifferent to the obvious risk that its policies, customs, and failure to train and supervise staff would violate detainees' constitutional rights.

91. Sheriff Fuller, the Jail's final policymaker, established and/or knew of these policies and customs and was deliberately indifferent to the obvious risk that they would violate detainees' constitutional rights.

92. These policies and customs were the moving force behind the violations of Mr. Bawa's rights.

93. Mr. Bawa suffered physical injury, pain, humiliation and the other injuries described in paragraph 63.

**COUNT V**

**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**

*(42 U.S.C. § 1983; Fourteenth Amendment — Against Defendant Hassing, the Deputy Defendants, Kalamazoo County, and Sheriff Fuller)*

94. Plaintiff incorporates all preceding paragraphs.

95. Mr. Bawa's ingrown toenail, which bled, became infected and kept him from walking or sleeping, and his broken tooth were serious medical needs.

96. Defendant Hassing closed Mr. Bawa’s request without examining him and told him to treat himself with borrowed nail trimmers, while acknowledging that improper treatment could "lead to worse problems." The Deputy Defendants knew of his condition and failed to ensure he received adequate care. Instead, they gave Mr. Bawa nail trimmers and instructed him to remove the toenail himself, which he did despite his unsanitary environment.

97. Defendant Hassing and the Deputy Defendants acted deliberately and recklessly in the face of an obvious risk. Their response amounted to no treatment at all.

98. Kalamazoo County is responsible for the medical care provided to detainees in its Jail, whether by its own employees or by a contractor. It is liable because this violation was caused by its policies and customs of closing detainee medical requests without examination and directing detainees to treat themselves, and by its failure to train and supervise medical staff and deputies on responding to medical requests. Kalamazoo County was deliberately indifferent to the obvious risk that its policies, customs, and failure to train and supervise staff would violate detainees’ constitutional rights.

99. Sheriff Fuller, the Jail's final policymaker, established and/or knew of these policies and customs and was deliberately indifferent to the obvious risk that they would violate detainees' constitutional rights.

100. These policies and customs were the moving force behind the violations of Mr. Bawa's rights.

101. Mr. Bawa suffered needless pain and injury.

**COUNT VI**

**DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS**

*(42 U.S.C. § 1983; Fourteenth Amendment — Against the City of Portage and the Property Custodian Defendants)*

102. Plaintiff incorporates all preceding paragraphs.

103. Mr. Bawa has a protected property interest in the Property. As of the date of the filing of this action, Defendants have not returned the Property to Mr. Bawa.

104. Any basis for holding the Property ended when the charges were dismissed on January 15, 2026. Defendants have kept it since then without forfeiture proceedings, notice, hearing, or any other process, and in defiance of the Circuit Court's May 27, 2026, order.

105. This retention is not a random act. It reflects the City's policy, custom or deliberate decision by officials with final authority over PDPS property to hold seized property "pending further investigation" after charges are dismissed. State post-deprivation remedies are inadequate where the City ignores a court order to return the property.

106. The police report generated and produced on June 5, 2026, was a frivolous attempt to justify the City retaining the Property "pending further investigation."

107. Mr. Bawa has lost the use of his money and phone and has incurred legal fees to attempt to recover them.

**COUNT VII**

**CLAIM AND DELIVERY, MCL 600.2920**

*(Against the City of Portage and the Property Custodian Defendants)*

108. Plaintiff incorporates all preceding paragraphs.

109. Mr. Bawa owns the Property and is entitled to possess it now.

110. Defendants have unlawfully detained the Property since at least January 15, 2026, and in defiance of a court order since May 27, 2026.

111. Mr. Bawa is entitled to recover the Property and the damages caused by its unlawful detention.

**COUNT VIII**

**CONVERSION, COMMON LAW AND MCL 600.2919a**

*(Against the Property Custodian Defendants)*

112. Plaintiff incorporates all preceding paragraphs.

113. By refusing to return the Property after the case was dismissed and a court ordered its return, Defendants wrongfully exercised dominion over it, inconsistent with Mr. Bawa's ownership.

114. Defendants did not act in good faith. They knew the case was over and the return had been ordered.

115. Defendants converted the Property to their own use and / or their employer's use. Mr. Bawa is entitled to actual damages and, under MCL 600.2919a, treble damages, costs and reasonable attorney fees.

**COUNT IX**

**UNJUST ENRICHMENT**

*(Pleaded in the Alternative – Against the City of Portage)*

116. Plaintiff incorporates all preceding paragraphs.

117. This claim is pleaded in the alternative under Fed. R. Civ. P. 8(d)(2). It seeks equitable restitution, not damages for a tort.

118. The City has received and retained a benefit from Mr. Bawa: $29,000.00 in U.S. currency and CAD $400.00, together with his Apple iPhone.

119. Any lawful basis for the City to hold the Property ended when all charges were dismissed on January 15, 2026. The City has no claim of ownership, has not initiated forfeiture proceedings, and has been ordered by the Circuit Court to return the Property.

120. The City's continued retention of the Property has resulted in an inequity to Mr. Bawa. It would be unjust for the City to keep the Property, or any benefit derived from holding it.

121. Mr. Bawa is entitled to restitution of the Property or its value, together with interest from at least January 15, 2026.

**COUNT X**

**GROSS NEGLIGENCE**

*(Against the Deputy Defendants)*

122. Plaintiff incorporates all preceding paragraphs.

123. The Deputy Defendants owed Mr. Bawa, who was in their custody, a duty to keep him reasonably safe and in sanitary conditions.

124. They breached that duty with conduct so reckless it showed a substantial lack of concern for whether he would be injured: leaving him in a sewage-flooded cell to clean it himself, overcrowding his cell and failing to supervise it, failing to protect him from assault, ignoring his medical needs, and ignoring his pleas to contact anyone.

125. Their gross negligence was the proximate cause of the injuries described in paragraph 63.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff asks the Court to enter judgment for him and against Defendants, jointly and severally, and to award:

A. compensatory damages in an amount to be determined at trial;

B. punitive damages against the individual Defendants;

C. an order requiring the City of Portage to return the Property immediately, with damages for its detention;

D. in the alternative, restitution of the Property or its value from the City of Portage, with interest from January 15, 2026;

E. treble damages, costs and attorney fees under MCL 600.2919a;

F. a declaration that Defendants violated Mr. Bawa's rights under the First and Fourteenth Amendments;

G. attorney fees, expert fees, and costs under 42 U.S.C. § 1988;

H. pre- and post-judgment interest; and

I. any other relief the Court finds just.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
**GEORGE LAW**
*/s/ Maggie P. George*
Maggie P. George (P85651)
Attorney for Plaintiff
444 S. Washington Ave,
Royal Oak, MI 48067
(248) 330-7223
mgeorge@georgelaw.com

*/s/ Melinda M. Gaied*
Melinda M. Gaied (P87996)
Attorney for Plaintiff
444 S. Washington Ave,
Royal Oak, MI 48067
(248) 510-1783
mgaied@georgelaw.com

Dated: November 6, 2026